UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X
BARBARA AYO and SOLOMON AYO; BETTY GORDON
and GEORGE GORDON; DIANNE LOFTON and DUKE
LOFTON; ERIN ROCHA and ANTONIO ROCHA; JAMES
GREEN, as proposed administrator of the
estate of HATTIE GREEN; JANET CELIK and AVNI
CELIK; CONSTANCE BATTS, as proposed
administrator of the estate of JULIUS BROOKS;
KAREN MORENCY; LISA TERRY and ANDREW TERRY;
JAMES GREEN, as proposed administrator of
the estate of MAMIE GREEN; MELVIN KENNEDY;    MEMORANDUM & ORDER
THERESA RIVERA and VINCENT RIVERA; WENDY      18-CV-0373(JS)(AYS)
GREEN and JAMES GREEN; ALAN PATTERSON;
ALAN PATTERSON, as proposed administrator of
the estate of MARION PATTERSON; CHESTER MORRIS;
CHESTER MORRIS, as proposed administrator of
the estate of OLIVER MORRIS; and CHESTER MORRIS,
as proposed administrator of the estate of
SERA MORRIS,

                          Plaintiffs,

          -against-

THE 3M COMPANY, f/k/a Minnesota Mining and
Manufacturing, Co.; TYCO FIRE PRODUCTS L.P.,
successor in interest to the Ansul Company;
BUCKEYE FIRE PROTECTION CO.; CHEMGUARD;
NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING,
INC., f/k/a Chubb National Foam, Inc.,
f/k/a National Foam, Inc., individually
and as successor in interest to National
Foam, Inc.; KIDDE PLC, INC., f/k/a Williams US
Inc., f/k/a Williams Holdings, Inc.,
individually and as successor in interest to
National Foam, Inc.; KIDDE-FENWAL, INC.,
individually and as successor in interest to
National Foam, Inc.; UTC FIRE & SECURITY
AMERICAS CORPORATION, INC., f/k/a GE
Interlogix, Inc.; ENTERRA CORPORATION; and
COUNTY OF SUFFOLK,

                          Defendants.
----------------------------------------X

APPEARANCES
For Plaintiffs:                 Frederick Eisenbud, Esq.
                                Scott D. Middleton, Esq.
                                Campolo, Middleton & McCormick, LLP
                                4175 Veterans Memorial Hwy., Ste. 400
                                Ronkonkoma, NY 11779

                                Hunter J. Shkolnik, Esq.
                                Paul J. Napoli, Esq.
                                Tate J. Kunkle, Esq.
                                Napoli Shkolnik PLLC
                                360 Lexington Avenue, 11th Floor
                                New York, NY 10017

For Defendants:
The 3M Company                  Andrew J. Calica, Esq.
                                Jordan D. Sagalowsky, Esq.
                                Michael A. Olsen, Esq.
                                Richard F. Bulger, Esq.
                                Mayer Brown LLP
                                1221 Avenue of the Americas
                                New York, NY 10020

Tyco Fire Products
L.P. and Chemguard              David S. Weinraub, Esq.
                                Katherine A. Armstrong, Esq.
                                Douglas E. Fleming, Esq.
                                Dechert LLP
                                1095 Avenue of the Americas
                                New York, NY 10036

Buckeye Fire
Protection Co.                  Ellen Nunno Corbo, Esq.
                                Taylor Colicchio LLP
                                100 Canal Pointe Blvd., Suite 210
                                Princeton, NJ 08540

                                Lisa A. Pieroni, Esq.
                                Kirschstein, Israel, Schiffmiller &
                                  Pieroni, P.C.
                                425 Fifth Avenue, 5th Floor
                                New York, NY 10016

                                Michael L. Carpenter, Esq.
                                Gray, Layton, Kersh, Solomon, Furr &
                                  Smith, P.A.
                                516 S New Hope Road

PO Box 2636
                              Gastonia, NC 28053

National Foam, Inc.        Keith E. Smith, Esq.
                           Greenberg Traurig, LLP
                           2700 Two Commerce Square
                           2001 Market Street
                           Philadelphia, PA 19103

Kidde Fire
Fighting, Inc.             No appearances

Kidde PLC, Inc., Kidde-
Fenwal, Inc., and UTC
Fire & Security Americas
Corporation, Inc.          Jonathan S. Zelig, Esq.
                           John W. Cerretta, Esq.
                           Jonathan I. Handler, Esq.
                           Day Pitney LLP
                           One International Place
                           Boston, MA 02110

Enterra Corporation        No appearances

County of Suffolk          Andrew Scott Kazin, Esq.
                           Brian A. Lacoff, Esq.
                           David R. Ehrlich, Esq.
                           Thomas E. Stagg, Esq.
                           Stagg, Terenzi, Confusione & Wabnik LLP
                           401 Franklin Avenue, Suite 300
                           Garden City, NY 11530

SEYBERT, District Judge:

        On December 11, 2017, Plaintiffs filed this action

against defendants The 3M Company, f/k/a Minnesota Mining and

Manufacturing, Co. ("3M"); Tyco Fire Products L.P., successor in

interest to the Ansul Company ("Tyco"); Buckeye Fire Protection

Co. ("Buckeye"); Chemguard; National Foam, Inc. ("National Foam");

Kidde PLC, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings,

Inc., individually and as successor in interest to National Foam,

Inc. ("Kidde PLC"); Kidde-Fenwal, Inc., individually and as successor in interest to National Foam, Inc. ("Kidde-Fenwal"); UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc. ("UTC"); Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam, Inc., individually and as successor in interest to National Foam, Inc. ("Kidde Fire Fighting"); Enterra Corporation ("Enterra," and collectively, "Manufacturing Defendants"); and the County of Suffolk (the "County," and together with Manufacturing Defendants, "Defendants") in the Supreme Court of the State of New York, County of Suffolk ("State Court"), claiming injuries stemming from the alleged contamination of their water supply by Manufacturing Defendants' products. (Compl., Docket Entry 1-1, at ECF pp. 6-72.) On January 18, 2018, Tyco removed the action to this Court pursuant to the federal officer removal statute, 28 U.S.C. §§ 1442(a)(1). (Notice of Removal, Docket Entry 1.)

Currently pending before the Court is Plaintiffs' motion to remand the case to State Court, (Remand Mot., Docket Entry 16), and Manufacturing Defendants' motion for leave to file a sur-reply in opposition to Plaintiff's motion to remand, (Sur-Reply Mot., Docket Entry 31).[1] For the reasons that follow, Plaintiffs' motion

---

[1] Two Manufacturing Defendants--Enterra and Kidde Fire Fighting--have not appeared or participated in this action. For ease of reference, the Court will not distinguish between those

to remand is DENIED and Manufacturing Defendants' motion for leave
to file a sur-reply is DENIED.

I.   The Alleged Contamination of Plaintiffs' Water

Plaintiffs are current and former residents of
communities in the Westhampton, Westhampton Beach, and Quiogue
areas of eastern Suffolk County, Long Island, New York (the
"Communities").  (Compl. ¶ 40.)  According to the Complaint, a
sole source aquifer[3] supplies water to the Communities (the
"Aquifer").  (Compl. ¶ 1.)

The Communities are close to and downgradient of the
Gabreski Air National Guard Base (the "Base"), which is part of
the Francis S. Gabreski Airport (the "Airport," and together with
the Base, "Gabreski") owned and operated by the County.  (Compl.
¶¶ 2, 33.)  Plaintiffs allege that the County leases 88.5 acres of

---

Manufacturing Defendants that have appeared and those that have
not.

[2] The following facts are drawn from the Complaint, Tyco's Notice
of Removal and the exhibits attached thereto, and materials the
parties submitted with their briefs.

[3] According to the U.S. Environmental Protection Agency ("EPA"),
a sole source aquifer is one that "supplies at least 50 percent
of the drinking water for its service area" where "[t]here are
no reasonably available alternative drinking water sources
should the aquifer become contaminated."  U.S. EPA, Overview of
the Drinking Water Sole Source Aquifer Program,
https://www.epa.gov/dwssa/overview-drinking-water-sole-source-
aquifer-program.

the Airport to the New York Air National Guard ("NYANG"),[4] and that for decades, the NYANG has used a half-acre Airport Fire Training Area located at the Airport. (Compl. ¶¶ 34-35.)

Plaintiffs aver that aqueous film-forming foam ("AFFF")--"a Class-B fire-fighting foam that is mixed with water and used to extinguish fires that are difficult to fight, including those involving hydrocarbon fuels such as petroleum or other flammable liquids"--has been used at Gabreski since 1970.[5] (Compl. ¶¶ 37, 152.) AFFF products are created synthetically by combining fluorine-free hydrocarbon foaming agents with highly fluorinated surfactants--agents that lower water's surface tension. (Aug. 2004 Report, Fleming Decl. Ex. D-7, Docket Entry 22-8, at 2; Compl. ¶ 154.) The fluorinated surfactants, or fluorosurfactants, in AFFF at issue in this case are perfluorinated chemicals ("PFCs"),[6] including specifically perfluorooctanesulfonic acid ("PFOS") and

_____

[4] The Air National Guard is the Reserve Component of the U.S. Air Force. National Guard, How We Began, http://www.nationalguard.mil/About-the-Guard/How-We-Began/.

[5] AFFF is more effective than ordinary water at extinguishing hydrocarbon-fuel fires because it forms an aqueous film that spreads along the surface of hydrocarbon fuels, "essentially smothering the fire." (See Compl. ¶¶ 153-54.)

[6] A perfluorinated chemical is "fully fluorinated," meaning that "all the carbon-hydrogen bonds in a chain have been replaced by carbon-fluorine ones." (Cheremisinoff Aff., Kunkle Decl. Ex. B, Docket Entry 16-5, at 3 ¶ 5.)

perfluorooctanoic acid ("PFOA").  (Compl. ¶¶ 4, 5, 10, 165, 170, 220.)

According to Plaintiffs, PFOA and PFOS are resistant to breakdown and can move through air and soil and into groundwater. (Compl. ¶¶ 171, 174.)  Additionally, Plaintiffs allege that PFCs, including PFOA and PFOS, are toxic and that they bioaccumulate in humans and animals.  (Compl. ¶¶ 172, 175-76.)  Specifically, Plaintiffs claim that studies concerning PFOA and PFOS have shown that exposure to the chemicals is associated with the development of serious medical conditions, including kidney and testicular cancer, ulcerative colitis, and thyroid disease, among others. (Compl. ¶¶ 9, 12, 195.)  Further, Plaintiffs allege that PFOA and PFOS are "presumed to be an immune hazard to humans."  (Compl. ¶ 18 (internal quotations marks omitted).)

Plaintiffs aver that Manufacturing Defendants designed, manufactured, and sold AFFF that was used at Gabreski.  (Compl. ¶ 160.)  They allege that the AFFF products contained PFOS, PFOA, and/or other PFCs that degrade into PFOS or PFOA.[7]  (Compl. ¶ 23.)[8]

---

[7] According to Plaintiffs, 3M produced the fluorosurfactants for its AFFF by a patented process called electrochemical fluorination, which resulted in a PFOS-based AFFF product (though some PFOS degrades into PFOA).  (Compl. ¶ 164.) Plaintiffs allege that 3M was the only company to synthesize PFOS-based AFFF and that the other Manufacturing Defendants produced AFFF using PFOA.  (Compl. ¶¶ 165, 170.)

[8] Plaintiffs name 3M, Tyco, National Foam, Buckeye, Chemguard, and Angus Fire as "Manufacturing Defendants," and omit Kidde

Plaintiffs claim that Manufacturing Defendants knew or should have known that PFCs are highly soluble in water, highly mobile, highly persistent in the environment, and highly likely to contaminate water supplies if released into the environment, and that using PFCs in AFFF "presented an unreasonable risk to human health, ground and surface water, and the environment." (Compl. ¶¶ 23, 27.) According to Plaintiffs, Manufacturing Defendants marketed and sold their AFFF products knowing that they would be used at airports and bases, including Gabreski, in a way that would release PFCs into the environment and contaminate the air, soil, and groundwater. (Compl. ¶¶ 24-29.) Plaintiffs allege that Manufacturing Defendants failed to warn the U.S. Department of Defense ("DoD"), the U.S. Air Force, Gabreski, municipal water suppliers, and residents of the Communities of the dangers posed by their AFFF products. (Compl. ¶ 30.)

Plaintiffs aver that the decades of use, storage, and disposal of Manufacturing Defendants' PFC-based AFFF products at Gabreski have caused the chemicals to enter the groundwater and contaminate the Aquifer. (Compl. ¶¶ 6, 8, 198-203, 206-209.) They claim that PFOA has been detected in the Communities and Aquifer

---

Fire Fighting, Kidde PLC, Kidde-Fenwal, UTC, and Enterra from the definition. (Compl. ¶ 23.) Though Plaintiffs later define National Foam to include these Defendants, (Compl. ¶ 150), they have not named Angus Fire as a defendant. The Court assumes that the reference to Angus Fire was in error.

in levels exceeding the EPA's current health advisory limit of seventy parts per trillion for the combined concentrations of PFOA and PFOS.[9] (Compl. ¶¶ 7, 14.) For instance, Plaintiffs allege that a groundwater-monitoring well near Gabreski was found to contain PFOS at a concentration of 14,300 parts per trillion. (Compl. ¶ 208.) Plaintiffs allege that because of the contamination, they have suffered personal injury, bioaccumulation of PFOA and other PFCs, increased risk and fear of developing health conditions, and property damage. (Compl. ¶¶ 39-41, 210-213; see Compl. ¶¶ 51-116.)

II. AFFF and PFCs

The U.S. Naval Research Laboratory ("NRL") developed aqueous film-forming firefighting foams in the 1960s. (Oct. 2009 NRL Press Release, Notice of Removal Ex. D, Docket Entry 1-4, at 3.) However, a 2006 NRL Memorandum Report recognizes the private sector's contribution to the development of AFFF, providing that while "NRL was responsible for the original concepts and formulations, it was necessary to elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations." (NRL Mem. Report, Fleming Decl. Ex. D-2, Docket Entry 22-3, at 37.) NRL acknowledges 3M

---

[9] According to Plaintiffs, the EPA's health advisory limit identifies the concentration of PFOA or PFOS in drinking water at or below which health effects are not expected to occur over a lifetime of exposure. (Compl. ¶ 192.)

specifically, stating that it "contributed considerably to the success of the development of AFFF." (NRL Mem. Report at 37.)

According to Plaintiffs, AFFF was introduced commercially in the mid-1960s, but "AFFF sold to the United States military"--"[u]nlike commercial AFFF formulations"--"must conform to the military-specific performance and quality control measurements as prescribed by the military specification ("Mil-Spec") Mil-F-24385." (Compl. ¶¶ 156-57.) As explained in a 2004 report prepared for the Fire Fighting Foam Coalition, the general difference between Mil-Spec and non-Mil-Spec AFFF is as follows: "Essentially all AFFF procured in the U.S. is specified to conform to either a foam standard of Underwriters Laboratory (UL) or a more stringent military specification (MilSpec). Generally speaking, MilSpec AFFFs contain more fluorosurfactant and more fluorine than UL agents." (Aug. 2004 Report, Fleming Decl. Ex. D-7, Docket Entry 22-8, at 2.) However, Plaintiffs highlight an affidavit prepared by their putative expert, Nicholas P. Cheremisinoff ("Cheremisinoff"), which provides that AFFF sold commercially often conforms to the Mil-Spec:

> AFFF products that were marketed and sold into non-military and other non-federal agencies were identical to those sold to the U.S. Military. It is wrong to assert or assume that AFFF products were made exclusively for and under the direction of the U.S. Military or that these products were any different or made to any different specifications for other customers. Most if not all AFFF

> manufacturer[ ]s['] Material Safety Data
> Sheets (MSDSs) carry a claim that their
> product meets the U.S. Mil Specs in terms of
> fire fighting performance . . . .

(Cheremisinoff Aff., Kunkle Decl. Ex. B, Docket Entry 16-5, at 6 ¶ 12.)

A.  <u>Military Specification for AFFF Products</u>

MIL-F-24385(NAVY), which was promulgated by the U.S. Navy's Naval Sea Systems Command ("NAVSEA") on November 21, 1969, addresses the military's requirements for AFFF. (MIL-F-24385(NAVY), Notice of Removal Ex. F, Docket Entry 1-6, § 1.1.) It does not compel AFFF manufacturers to use PFOA or PFOS, but requires that AFFF concentrate "consist of fluorocarbon surfactants plus other compounds as required to conform to the requirements specified hereinafter." (Compl. ¶ 158; Notice of Removal ¶ 8; MIL-F-24385(NAVY) § 3.2.). The Mil-Spec has since been amended and revised, most recently on September 7, 2017. (<u>See</u> Mil-Spec 24385 Revisions, <u>http://quicksearch.dla.mil/qsDocDetails .aspx?ident number=17270</u>.) The current revision, MIL-PRF-24385F(SH), like the 1969 version, requires that AFFF products include fluorocarbon surfactants. (MIL-PRF-24385F(SH), Notice of Removal Ex. H, Docket Entry 1-8, § 3.2.) Unlike the 1969 version, however, it specifically sets maximum limits on PFOS and PFOA content and explains that "[i]n the short term, the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations

of . . . PFOS and PFOA." (See MIL-PRF-24385F(SH) §§ 3.3, 6.6 and Table I.)

The Mil-Spec provides that AFFF furnished to the military must be "qualified for listing on the applicable Qualified Products List" ("QPL") and calls for "qualification" and "quality conformance" inspections with respect to a number of product characteristics. (E.g., MIL-PRF-24385F(SH) §§ 3.1, 3.3, 4 and Tables I, II, and III.) While "the contractor is responsible for the performance of all inspection requirements," "[t]he Government reserves the right to perform any of the inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements." (MIL-PRF-24385F(SH) § 4.1.) Manufacturing Defendants submitted with their opposition the Declaration of Philip Novac, who served as Global Director of Foam Systems for Tyco or its affiliates. (Novac Decl., Docket Entry 22-21, ¶¶ 1-2.) According to Novac, DoD "has tested military specification AFFF products of Tyco [ ] and other military specification AFFF manufacturers." (Novac Decl. ¶ 10.)

The Mil-Spec refers to DoD document SD-6, "Provisions Governing Qualification," which provides that generally, the agency that prepared the specification--here, NAVSEA--"is responsible for qualification." (SD-6, Notice of Removal Ex. G, Docket Entry 1-7, at 3; Mil-Spec 24385 Revisions ("Preparing

Activity: SH Naval Sea Systems Command (Ship Systems)"); e.g.,
MIL-PRF-24385F(SH) § 6.4.)  SD-6 defines "qualification" as the
process of "examin[ing], test[ing], and approv[ing]" products "to
be in conformance with specification requirements" and approving
them for inclusion on the QPL.  (SD-6 at 1.)  All products on the
AFFF QPL must be compatible with one another.  (E.g., MIL-PRF-
24385F(SH) § 3.3.3.)  At various times from 1976 through 2017, all
Manufacturing Defendants were on the QPL as manufacturers
certified to sell AFFF under the Mil-Spec.  (Compl. ¶ 159.)

B.  Awareness of Issues with PFCs

1.  Manufacturing Defendants

According to Plaintiffs, 3M began producing PFOA in 1947
and began researching the toxicity of PFCs in 1950.  (Compl.
¶¶ 168, 234.)  Plaintiffs aver that as early as the mid-1950s, 3M
knew that PFCs accumulate in humans and animals.  (Compl. ¶ 235.)
Plaintiffs claim that by the early 1960s, 3M knew that PFOS and
PFOA were "stable, persistent in the environment, and did not
degrade," and "that PFCs were potentially toxic to humans and the
environment."  (Compl. ¶¶ 173, 233.)  Further, Plaintiffs aver
that 3M studies from the 1970s concluded that PFCs were "even more
toxic" than previously believed.  (Compl. ¶¶ 176.)  They allege
that 3M knew that after consumption or inhalation, PFOA is absorbed
by and accumulates in the body--primarily in the blood stream,
kidneys, and liver.  (Compl. ¶ 177.)  Plaintiffs claim that by the

1970s, 3M knew that PFOA and PFOS were "widely present in the blood of the general U.S. population" and that 3M concealed that knowledge from the public, government regulators, and the officials responsible for buying AFFF and supplying it to Gabreski. (Compl. ¶ 178.) For example, Plaintiffs claim that internal 3M documents disclosed by a whistleblower to the EPA in 1998 revealed that 3M was "perpetuating the myth" to regulators and customers that PFCs were biodegradable, when 3M knew that they were not. (Compl. ¶ 232.) Further, Plaintiffs claim that 3M began monitoring its employees' blood for PFCs as early as 1976 and confirmed that they bioaccumulate: PFC levels were found to increase over time and remain in blood for long periods. (Compl. ¶ 238.) Additionally, Plaintiffs allege that in approximately 1977, Tyco was aware of the environmental and toxic effects of AFFF and studied whether it could create an AFFF product that had a less substantial impact on the environment.[10] (Compl. ¶ 179.) Plaintiffs allege that "[t]hereafter[,] all remaining Defendants came to know what 3M knew: that their own AFFF did not biodegrade, persisted in the environment, and bioaccumulated in human blood." (Compl. ¶ 239.)

_____

[10] The Cheremisinoff Affidavit contains a number of specific allegations with respect to 3M's and Tyco's claimed knowledge and concealment of the properties and effects of PFCs in AFFF. (Cheremisinoff Aff., at 9-14, ¶¶ 1-24.) Because they largely overlap with or elaborate on the allegations above, the Court does not discuss them here.

According to Plaintiffs, "[i]n an attempt to limit liability," 3M stopped producing PFOS in 2002 "because it was aware of the widespread contamination and the health effects on the American public associated with exposure to the contamination." (Compl. ¶ 166.)  Plaintiffs aver that in 2006, in light of PFOA's toxicity, eight major PFOA producers agreed to participate in the EPA's "PFOA Stewardship Program," pursuant to which the companies voluntarily committed to reduce product content and facility emissions of PFOA and related chemicals by ninety-five percent by no later than 2010.  (Compl. ¶ 180.)

### 2. The U.S. Government

Manufacturing Defendants highlight several documents evidencing the government's awareness of risks posed by fluorocarbon surfactants in AFFF products.  (Mfg. Def.s' Opp., Docket Entry 22, at 20-22.)  For example, they point to a 1980 report prepared with the support of components of the U.S. Navy, Air Force, and Army, which provides that "[a]ll of the constituents resulting from fire fighting exercises [using fluorocarbon-based AFFF] are considered to have adverse effects environmentally." (Oct. 1980 Report, Fleming Decl. Ex. D-12, Docket Entry 22-13, at 1.)  Additionally, the report notes that "[f]ire fighting training exercises at military installation[s] consume large quantities of water and fire fighting chemical agents," which "results in intermittent discharges of waste streams containing high strength

of potentially toxic pollutants." (Oct. 1980 Report at 17.) The 1980 report also states that "[w]astewater generated from fire fighting exercises ha[s] an adverse effect upon the receiving stream and resist[s] biodegradation." (Oct. 1980 Report at 3.) Further, according to a 2001 letter from the DoD's Assistant Deputy Under Secretary of Defense,

> The application of AFFF in firefighting is inherently dispersive and results in the distribution of AFFF's chemical components on the surface and in the groundwater. Concern about this distribution prompted Military Service Departments to investigate the biodegradation, possible remediation, toxicity, fate and transport of many of AFFF's components. These studies date back to 1983 or earlier and are on going. . . . My assertion that PFOA is more toxic than PFOS is based on these data. . . .

(2001 Letter, Fleming Decl. Ex. D-16, Docket Entry 22-17, at 1.)

According to documents submitted by Manufacturing Defendants, DoD views PFCs as necessary components of AFFF. As described in a 2017 U.S. Government Accountability Office ("GAO") Report to Congressional Committees on DoD's handling of emerging drinking-water contaminants, the AFFF Mil-Spec requires the use "of 'fluorocarbon surfactants,' which the Navy interprets as synonymous with PFCs." (2017 GAO Report, Fleming Decl. Ex. D-10, Docket Entry 22-11, at 1-4, 17 n.46.) Additionally, the report provides that "[a]ccording to DOD, at present there is no PFC-free firefighting foam that meets DOD's performance and compatibility

requirements.  As a result, the Navy has no plans to remove the requirement for firefighting foam to contain PFCs at this time." (2017 GAO Report at 19.)  Thus, the current AFFF Mil-Spec explains:

> The DoD's goal is to acquire and use a non-fluorinated AFFF formulation or equivalent firefighting agent to meet the performance requirements for DoD critical firefighting needs.  The DoD is funding research to this end, but a viable solution may not be found for several years.  In the short term, the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of two particular per- and PFAS; specifically PFOS and PFOA.

(MIL-PRF-24385F(SH) § 6.6.)

PROCEDURAL HISTORY

On December 11, 2017, Plaintiffs filed this action in State Court, and on January 18, 2018, Tyco removed it to this Court.  Plaintiffs assert claims for (1) Negligence, (Compl. ¶¶ 243-62); (2) "Failure to Warn (as against [the County]),"  (Compl. ¶¶ 263-78); (3) "Products Liability, Failure to Warn (as against the Manufacturing Defendants),"  (Compl.  ¶¶ 279-96); (4) "Strict Product Liability - Defective Design (as against the Manufacturing Defendants)," (Compl. ¶¶ 297-315); (5) "Trespass (as against [the County])," (Compl.  ¶¶ 316-26); and (6) "Private Nuisance ([b]y Plaintiffs Betty Gordon, George Gordon, Lisa Terry, Andrew Terry, Theresa Rivera, Vincent Rivera, and Alan Patterson)," (Compl. ¶¶ 327-44).  Plaintiffs seek declaratory and injunctive relief; "general, compensatory, exemplary,

consequential, nominal, and punitive damages"; attorneys' fees and costs; and pre- and post-judgment interest. (Compl. at 60-66.)

On February 20, 2018, Plaintiffs filed a motion to remand, which Defendants opposed on March 6, 2018. (See Remand Mot.; Mfg. Def.s' Opp.; County's Opp., Docket Entry 23). Plaintiffs filed a reply brief on March 13, 2018, (Pl.s' Reply, Docket Entry 24), and on March 20, 2018, Manufacturing Defendants filed a motion for leave to file a sur-reply, which they attached to their motion. (Sur-Reply Mot.; Sur-Reply Br., Docket Entry 31-1.) On March 27, 2018, Plaintiffs filed an opposition to Manufacturing Defendants' request. (Sur-Reply Opp., Docket Entry 37.)

Defendants' time to answer or otherwise respond to the Complaint has been extended to thirty days after the Court rules on Plaintiffs' motion to remand. (See Feb. 2, 2018 Elec. Order; Consent Mot., Docket Entry 11.)

DISCUSSION

I. Plaintiffs' Motion to Remand

Tyco removed this action from State Court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), to have its federal government contractor defense adjudicated in a federal forum. (Not. of Removal ¶ 1.) Plaintiffs ask the Court to remand this case to State Court pursuant to 28 U.S.C. § 1447, arguing that Manufacturing Defendants do not satisfy the elements

of the federal officer removal statute and are not entitled to the government contractor defense. (Pl.s' Br., Docket Entry 16-1, at 1-2.)

The federal officer removal statute allows a case to be removed from state court to federal court when it was commenced against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof . . . for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). The statute insulates the U.S. Government and its agents from state "interference with its 'operations'" by shielding it from "'local prejudice'" and providing "a federal forum in which to assert federal immunity defenses." Watson v. Philip Morris Companies, Inc., 551 U.S. 142, 150, 127 S. Ct. 2301, 2306, 168 L. Ed. 2d 42 (2007) (quoting Willingham v. Morgan, 395 U.S. 402, 406, 89 S. Ct. 1813, 1815, 23 L. Ed. 2d 396 (1969); State of Maryland v. Soper (No. 1), 270 U.S. 9, 32, 46 S. Ct. 185, 190, 70 L. Ed. 449 (1926)) (citations omitted). The burden to show that removal is proper rests with the removing defendant. Veneruso v. Mount Vernon Neighborhood Health Ctr., 586 F. App'x 604, 607 (2d Cir. 2014) (citing United Food & Comm. Workers Union v. CenterMark Props. Meriden Square, Inc., 30 F.3d 298, 301 (2d Cir. 1994)). However, the federal

officer removal statute "must be liberally construed."[11] <u>Isaacson v. Dow Chemical Co</u>, 517 F.3d 129, 136 (2d Cir. 2008) (citing <u>Watson</u>, 551 U.S. at 147, 127 S. Ct. at 2304-05). Therefore, while removal under the general removal statute, 28 U.S.C. § 1441, is generally disfavored, removal under the federal officer removal statute "is favored in the interest of public policy." <u>Albrecht v. A.O. Smith Water Prod.</u>, No. 11-CV-5990, 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citing <u>Jefferson Cty. v. Acker</u>, 527 U.S. 423, 431, 119 S. Ct. 2069, 2075, 144 L. Ed. 2d 408 (1999)); <u>see also</u> <u>Gordon v. Air & Liquid Sys. Corp.</u>, 990 F. Supp. 2d 311, 316 (E.D.N.Y. 2014) (quoting <u>Willingham</u>, 395 U.S. at 407, 89 S. Ct. at 1816) (explaining that characterization of defendant's burden as "heavy" "misse[d] the distinction between the general removal statutes, which are to be strictly construed, and federal-officer removal, which 'should not be frustrated by a narrow, grudging

_____

[11] Citing two out-of-circuit cases, <u>Freiberg v. Swinerton & Walberg Property Services, Inc.</u>, 245 F. Supp. 2d 1144, 1152 n.6 (D. Colo. 2002), and <u>Weese v. Union Carbide Corp.</u>, No. 07-CV-0581, 2007 WL 2908014, at *3 (S.D. Ill. Oct. 3, 2007), Plaintiffs contend that the statute must be read narrowly when the liability of private companies, rather than that of the U.S. Government or its agencies or officers, is at stake. (Pl.s' Br. at 5.) However, the Second Circuit drew no such distinction when discussing the statute's application to private chemical companies in <u>Isaacson</u>, 517 F.3d at 136 (noting that "the statute as a whole must be liberally construed"), nor did the Supreme Court when discussing its applicability to a private cigarette manufacturer in <u>Watson</u>, 551 U.S. at 147, 127 S. Ct. at 2304-05 (noting that the Supreme Court "has made clear that the statute must be 'liberally construed.'"). The Court declines to adopt a narrow reading of the statute here.

interpretation.'"). Accordingly, the Court views the facts in the light most favorable to the defendants. Albrecht, 2011 WL 5109532, at *3 (citing Hagen v. Benjamin Foster Co., 739 F. Supp. 2d 770, 783 (E.D. Pa. 2010); Durham v. Lockheed Martin Corp., 445 F.3d 1247, 1249 (9th Cir. 2006)).

A defendant other than the United States or a federal agency or officer must satisfy three elements to effect removal under the statute: (1) "[I]t must show that it is a 'person' within the meaning of the statute"; (2) "it must establish that it was 'acting under' a federal officer, which subsumes the existence of a 'causal connection' between the charged conduct and asserted official authority"[12]; and (3) it "must raise a colorable federal defense." Veneruso, 586 F. App'x at 607 (citing In re Methyl Tertiary Butyl Ether Prods. Liab. Litig., 488 F.3d 112, 124 (2d Cir. 2007) ("In re MTBE Prods. Liab. Litig."); Isaacson, 517 F.3d at 135. Plaintiffs do not dispute that Manufacturing Defendants are "person[s]" for purposes of 28 U.S.C. § 1442, (Pl.s' Br. at 6), but they argue that Manufacturing Defendants were not "acting under" an officer of the United States in producing AFFF with PFCs,

---

[12] In Isaacson, the Second Circuit noted that the statutory requirement that the defendants' actions were taken "'under color of [federal] office'" "has come to be known as the causation requirement." Isaacson, 517 F.3d at 137 (quoting 28 U.S.C. § 1442(a)(1)) (alteration in original) (citation omitted).

(Pl.s' Br. at 7-10), and that they have no colorable federal defense, (Pl.s' Br. at 10-15).

A.   "Acting Under" a Federal Officer and Causal Connection

For a private entity to show that it is "acting under" a federal officer, it must "demonstrate that the assistance it provides to a federal officer 'goes beyond simple compliance with the law and helps officers fulfill other basic governmental tasks.'" Veneruso, 586 F. App'x at 607 (quoting Watson, 551 U.S. at 153, 127 S. Ct. at 2308); see also Isaacson, 517 F.3d at 137 ("'[A]n entity 'act[s] under' a federal officer when it 'assist[s], or . . . help[s] carry out, the duties or tasks of the federal superior.'") (quoting Watson, 551 U.S. at 152, 127 S. Ct. at 2307) (emphasis, ellipsis, and second, third, and fourth alterations in original).   "The words 'acting under' are to be interpreted broadly, and the statute as a whole must be liberally construed." Isaacson, 517 F.3d at 136 (citing Watson, 551 U.S. at 147, 127 S. Ct. at 2304-05).   However, "compliance (or noncompliance) with federal laws, rules, and regulations" is not enough, "'even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored.'"  Veneruso, 586 F. App'x at 607 (quoting Watson, 551 U.S. at 153, 127 S. Ct. at 2308).

The additional need for a "causal connection" between the charged conduct and the purported official action is satisfied

22

if "the act that is the subject of [the p]laintiffs'
attack . . . occurred <u>while</u> [d]efendants were performing their
official duties." <u>Isaacson</u>, 517 F.3d at 137-38 (citations omitted)
(emphasis in original). "'Critical under the statute is to what
extent defendants acted under federal direction at the time they
were engaged in conduct now being sued upon.'" <u>Veneruso</u>, 586 F.
App'x at 607 (quoting <u>In re MTBE Prods. Liab. Litig.</u>, 488 F.3d at
124-25). The Court must "credit [d]efendants' theory of the case"
in resolving this inquiry. <u>Isaacson</u>, 517 F.3d at 137 (citing
<u>Acker</u>, 527 U.S. at 432, 119 S. Ct. at 2075). Several cases
illustrate these principles.

In <u>Watson</u>, the Supreme Court held that the defendant
Philip Morris Companies did not properly effect removal under the
statute because it was not "acting under" a federal officer or
agency when advertising and testing its cigarettes pursuant to the
Federal Trade Commission's ("FTC") detailed rules and regulations.
<u>Watson</u>, 551 U.S. at 157, 127 S. Ct. at 2310. Distinguishing
private contractors that assist the government from entities
subject to detailed regulation, the Supreme Court explained:

> [A] private contractor . . . is helping the
> Government to produce an item that it needs.
> The assistance that private contractors
> provide federal officers goes beyond simple
> compliance with the law and helps officers
> fulfill other basic governmental tasks. In

> the context of <u>Winters</u>,[13] for example, Dow
> Chemical fulfilled the terms of a contractual
> agreement by providing the Government with a
> product that it used to help conduct a war.
> Moreover, at least arguably, Dow performed a
> job that, in the absence of a contract with a
> private firm, the Government itself would have
> had to perform.

<u>Id.</u> at 153-54, 127 S. Ct. at 2308.  The Supreme Court concluded

that Philip Morris' compliance with FTC's detailed regulations did

not establish the "special relationship" required by the "acting

under" prong.  <u>Id.</u> at 157, S. Ct. at 2310 (emphasis in original).

In <u>Isaacson</u>, the Second Circuit affirmed the district

court's denial of plaintiffs' motion to remand after the

defendants--chemical companies that contracted with the United

States to manufacture Agent Orange for military use in the Vietnam

War--removed the case pursuant to the federal officer removal

statute.  <u>Isaacson</u>, 517 F.3d at 133.  Distinguishing <u>Watson</u>, the

<u>Isaacson</u> Court found that defendants were "acting under" a federal

officer when they "contracted with the Government to provide a

product that the Government was using during war--a product that,

in the absence of Defendants, the Government would have had to

produce itself."  <u>Id.</u> at 137.  The defendants "received delegated

authority" and had a "special relationship" with the government;

---

[13] In <u>Winters v. Diamond Shamrock Chem. Co.</u>, 149 F.3d 387 (5th
Cir. 1998), the Fifth Circuit held that private manufacturers of
Agent Orange were entitled to removal under the federal officer
removal statute.  <u>Id.</u> at 396-401.

they were not merely "regulated by federal law."  _Id._
Additionally, the Second Circuit found that the statute's
causation requirement was met because the defendants' production
of the toxic chemical dioxin "occurred because of what they were
asked to do by the Government."  _Id._ at 137-38 (emphasis in
original).  Specifically, under the defendants' theory of the case,
the government dictated Agent Orange's method of formulation and
knew that it contained dioxin, so the production of dioxin
"naturally would have occurred during the performance of these
government-specified duties."  _Id._

          Similarly, in _Gordon_, Judge Bianco of this Court denied
the plaintiff's motion to remand a case removed pursuant to
28 U.S.C. § 1442(a)(1).  _Gordon_, 990 F. Supp. 2d at 314.  Judge
Bianco found that defendants, manufacturers of asbestos-containing
products used aboard U.S. Navy vessels, were "acting under" a
federal officer in building "Navy ship components that are of the
same necessary character [as the Agent Orange in _Isaacson_],
especially when considering the vital role of warships in our
nation's defense."  _Id._ at 317.  The Court found there to be
colorable evidence that the defendants acted under the U.S. Navy
"by working hand-in-hand with naval authorities to ensure
compliance with exacting technical demands."  _Id._  Further, Judge
Bianco held that by introducing evidence that they "made their
products because the Navy agreed to procure them," the defendants

cleared the low hurdle erected by the causation requirement.  Id.
at 318.

Here, for purposes of Plaintiffs' motion to remand,
there is evidence that Manufacturing Defendants were "acting
under" the DoD when producing Mil-Spec AFFF.  First, an NRL
document shows that the government asked the chemical industry to
help it produce and improve AFFF, specifically, by "synthesiz[ing]
the fluorinated intermediates" in the products.  (NRL Mem. Report
at 37 ("Although NRL was responsible for the original concepts and
formulations, it was necessary to elicit the aid of the chemical
industry to synthesize the fluorinated intermediates and agents to
achieve improvements in formulations. . . . 3M [ ] contributed
considerably to the success of the development of AFFF.").)  A
firm that helps the government develop a product at the
government's request does more than "simply comply[ ] with the
law."  Cf. Watson, 551 U.S. at 152-53, 127 S. Ct. at 2307-08
(emphasis in original).

Second, AFFF is a "mission-critical" and life-saving
product that--like the Agent Orange in Isaacson or the ship
components in Gordon--"the Government would have had to produce
itself" in the absence of private contractors.  See Isaacson, 517
F.3d at 137; Gordon, 990 F. Supp. 2d at 317; (Nov. 2017 DoD Report
to Congress, Fleming Decl. Ex. D-5, Docket Entry 22-6, at 1
(describing AFFF as a "mission critical product [that] saves lives

26

and protects assets"); Oct. 2009 NRL Press Release at 3 ("Following the destructive fires aboard the USS Forrestal and USS Enterprise, the Navy pursued new firefighting agents. NRL responded to this need by developing AFFF. In the military, AFFF is now on all Navy ships and submarines, and is used by all branches of the U.S. armed forces and NATO members."); NRL Mem. Report at 37 (describing the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety")). Through contracts with the government, Manufacturing Defendants formulated, produced, and supplied these essential AFFF products to the military. See Isaacson, 517 F.3d at 137; (Compl. ¶ 215 (alleging that Manufacturing Defendants "regularly contract with . . . the DOD, the [U.S. Air Force], specific installations, and/or third-party logistic intermediaries, to sell and deliver AFFF to bases throughout the country, including to Gabreski"); MIL-PRF-24385F(SH) § 6.4 ("[M]anufacturers are urged to arrange to have the products that they propose to offer to the Federal Government tested for qualification in order that they may be eligible to be awarded contracts or orders for the products covered by this specification."). Thus, Manufacturing Defendants "'assist[ed]' and 'help[ed] carry out[ ] the duties or tasks of' officers at the" DoD and "had the 'special relationship' with the Government

required by the 'acting under' prong."[14]  See Isaacson, 517 F.3d
at 137 (alterations in original) (quoting Watson, 551 U.S. at 152,
S. Ct. at 2307).

Additionally, there is evidence of a "causal connection"
between the use of PFCs in AFFF and the design and manufacture of
AFFF for the government.  See Isaacson, 517 F.3d at 137-38.  To
satisfy the causation requirement, Manufacturing Defendants need
only show that the conduct at issue occurred during their
performance of the government-directed action, even if the
government did not call for the complained-of act.  See id.
("[E]ven if Plaintiffs were to prove that the dioxin contamination
occurred because of an act not specifically contemplated by the
government contract, it is enough that the contracts gave rise to
the contamination.").  Despite Plaintiffs' argument to the
contrary, Manufacturing Defendants need not show that there is a

---

[14] Plaintiffs also maintain that since Manufacturing Defendants
"were free to develop their own products with their own chemical
manufacturing specifications, utilizing whatever chemicals and
ingredients it or they desired," they were not "acting under" a
federal officer when manufacturing Mil-Spec AFFF products.
(Pl.s' Br. at 8.)  Additionally, they argue that Mil-Spec AFFF
is a "stock" or "off-the-shelf" product that cannot have been
made "under" a federal officer for purposes of the federal
officer removal statute.  (Pl.s' Br. at 8-9.)  The Court
addresses these arguments infra, within the context of whether
Manufacturing Defendants have asserted a colorable federal
defense.  See Albrecht, 2011 WL 5109532, at *5 ("The acting
under and causal connection prongs of § 1442 . . . often turn on
much of the same evidence as the colorable federal defense
prong.") (citations omitted).

"link between the Defendants choosing PFOA and PFOS as their
preferred fluorinated surfactant, of which there are thousands, in
their AFFF and any federal officer ordering those chemicals to be
added." (Pl.s' Br. at 9.) Crediting Manufacturing Defendants'
theory of the case, the use of PFCs "occurred because of what they
were asked to do by the Government"--to design and manufacture
Mil-Spec AFFF products--and that is enough regardless of whether
the Mil-Spec or any contract called for the use of PFCs. See
Isaacson, 517 F.3d at 137–38 (emphasis in original) (citations
omitted).

    B.   Colorable Federal Defense

        Having found that the "acting under" and causation
requirements are satisfied, the Court turns to the remaining prong
of the federal officer removal statute, whether Manufacturing
Defendants have raised a colorable federal defense. At this stage
of the litigation, Manufacturing Defendants need only show that
their defense is "colorable." Willingham, 395 U.S. at 406–07, 89
S. Ct. at 1816. "Because a core purpose of the statute is to let
the 'validity of the [federal] defense' be 'tried in federal
court,' a defendant seeking removal need not 'virtually . . . win
his case,' nor must his defense even be 'clearly sustainable' on
the facts." Cuomo v. Crane Co., 771 F.3d 113, 115–16 (2d Cir.
2014) (internal citations omitted) (alterations in original).
"[T]he district court's role . . . is not to resolve whether the

29

defendant has established the federal [ ] defense or to resolve factual disputes, but only to ensure the existence of some competent evidence supporting a 'colorable' federal defense." Id. at 117. Like the threshold for asserting a colorable defense at this stage, Manufacturing Defendants' burdens of production and persuasion are low. Id.; Gordon, 990 F. Supp. 2d at 318.

Here, Manufacturing Defendants intend to assert the government contractor defense, which was recognized by the Supreme Court in Boyle v. United Technologies Corp., 47 U.S. 500, 108 S. Ct. 2510, 101 L. Ed. 2d 422 (1988). This defense provides that a contractor may not be held liable under state law for design defects in equipment produced for the government "when: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle, 487 U.S. at 512, 108 S. Ct. at 2518; see In re Agent Orange Prod. Liab. Litig., 517 F.3d 76, 88 (2d Cir. 2008). The defense overrides duties imposed by state law to protect "the government's discretionary authority over areas of significant federal interest such as military procurement." In re Agent Orange Prod. Liab. Litig., 517 F.3d at 90-91; Boyle, 487 U.S. at 511, 108 S. Ct. at 2518 ("We think that the selection of the appropriate design for military equipment to be used by our Armed Forces is

assuredly a discretionary function . . . ."); see also Gordon, 990
F. Supp. 2d at 318 (noting that the defense is not meant "'to
protect the contractor as a contractor'") (quoting McCue v. City
of New York, 521 F.3d 169, 194 (2d Cir. 2008) (internal quotation
marks omitted)).

## 1.   Approval of Reasonably Precise Specifications

Key to the determination of whether the government has
approved reasonably precise specifications is whether it "made a
discretionary determination about the material it obtained that
relates to the defective design feature at issue" such that the
government is the "'agent[ ] of decision.'"  In re Agent Orange
Prod. Liab. Litig., 517 F.3d at 90-91 (quoting In re Joint E. & S.
Dist. New York Asbestos Litig., 897 F.2d 626, 630 (2d Cir. 1990)).
For this requirement to be satisfied, "the government's
discretionary actions with respect to the allegedly defective
design and the alleged state law tort duty [must] conflict."  Id.
at 92-93 (emphasis removed).

Defendants may establish that the government approved
reasonably precise specifications in several ways short of showing
that the government independently prepared them.  See id. at 91
("'[I]t is necessary only that the government approve, rather than
create, the specifications. . . .'") (quoting Carley v. Wheeled
Coach, 991 F.2d 1117, 1125 (3d Cir. 1993) (alteration and ellipsis
in original)).  For instance, even if the defendants contributed

significantly "in suggesting specifications," "[t]he government exercises adequate discretion over the contract specifications to invoke the defense if it independently and meaningfully reviews the specifications." See id. at 91 (citing Harduvel v. Gen. Dynamics Corp., 878 F.2d 1311, 1320 (11th Cir. 1989) (citations omitted)). Similarly, the Eleventh Circuit has held that the requirement is satisfied where "the contractor incorporated government performance specifications into a design that the government subsequently reviewed and approved" and the design was the result of a "continuous back and forth" between the government and the contractor. Harduvel, 878 F.2d at 1320 (citations and internal quotation marks omitted). A party may also meet this requirement by demonstrating that the government reordered the product with knowledge of the alleged design defect. In re Agent Orange Prod. Liab. Litig., 517 F.3d at 95-96. Additionally, the Seventh Circuit has held that the government approves reasonably precise specifications when it, among other things, issues performance requirements that significantly constrain the contractor's design choices. Oliver v. Oshkosh Truck Corp., 96 F.3d 992, 999 (7th Cir. 1996). However, "[w]here the government 'merely rubber stamps a design, . . . or where the [g]overnment merely orders a product from stock without a significant interest in the alleged design defect,' the government has not made a discretionary decision in need of protection, and the defense is

therefore inapplicable." In re Agent Orange Prod. Liab. Litig., 517 F.3d at 90 (alteration and ellipsis in original) (quoting Lewis v. Babcock Indus., Inc., 985 F.2d 83, 87 (2d Cir. 1993)).

Plaintiffs contend that the government never approved "reasonably precise specifications" since the AFFF Mil-Spec sets out only "performance specifications," not "manufacturing or product specifications." (Pl.s' Br. at 11-13.) Specifically, Plaintiffs argue that though the AFFF Mil-Spec calls for a "fluorinated surfactant," there are thousands of such ingredients, and each manufacturer was free to choose which of them it would use in its AFFF formulation. (Pl.s' Br. at 11-12; see Cheremisinoff Aff. at 4, ¶ 3.) They cite Trevino v. General Dynamics Corp., 865 F.2d 1474 (5th Cir. 1989), (Pl.'s Br. at 12), for the proposition that there is no government approval of reasonably precise specifications when a contractor follows general performance standards that leave the design at issue to the contractor's discretion and there is no meaningful review of the design by the government. Id. at 1486.

For purposes of Plaintiffs' motion to remand, this argument fails. "Although the evidence provided by [Manufacturing Defendants] may ultimately prove insufficient to support its defense on the merits, the Court finds that [p]laintiffs overestimate the demands of § 1442 at this stage of the proceedings." Albrecht, 2011 WL 5109532, at *4. That is, while

a fully developed record may reveal that the Mil-Spec left all design decisions--including the selection of fluorocarbon surfactants other than PFCs--to Manufacturing Defendants' discretion, or that the government merely "rubber stamped" Manufacturing Defendants' formulations, Manufacturing Defendants have submitted colorable evidence to the contrary.

Under the Mil-Spec, to be eligible to sell AFFF products to the military, Manufacturing Defendants not only have to design and produce them in compliance with standards regarding materials, compatibility with other AFFF formulations, and chemical, physical, and performance characteristics, but also need to have their products tested, qualified, and placed on the QPL by the DoD. (E.g., MIL-PRF-24385F(SH) §§ 3.1, 3.3-3.4, 4, 6.4 and Tables I, II, and III.) Similarly, Novac--Global Director of Foam Systems for Tyco or its affiliates--stated in his declaration that "[t]he military sets detailed specifications for [Mil-Spec AFFF] . . . products" related to AFFF's "performance, . . . quality, physical properties, labeling, and content," and that DoD "has tested military specification AFFF products of Tyco [ ] and other military specification AFFF manufacturers." (Novac Decl. ¶¶ 2-5, 10.) Novac also explains that the Mil-Spec's requirement that AFFF products on the QPL be compatible with one another "necessarily limits the design and content" of Mil-Spec AFFF formulations. (Novac Decl. ¶ 8); see Oliver, 96 F.3d at 999 (finding that the

Marine Corps approved reasonably precise specifications where, inter alia, performance requirements "cabined significantly" the design feature at issue). Additionally, a Federal Aviation Administration Report on AFFF suggests that the Mil-Spec is more than solely a performance specification. Specifically, it provides that the AFFF Mil-Spec

> is a procurement specification as well as a
> performance specification. As a result, there
> are also requirements for packaging, initial
> qualification inspection, and quality
> conformance inspection. Equipment designs
> unique to the military . . . also impact on
> the specification requirements. . . . [The
> Mil-Spec] addresses . . . important chemical
> and physical properties as well.

(1994 FAA Report, Fleming Decl. Ex. D-9, Docket Entry 22-10, at 23.) Moreover, there is evidence rebutting Plaintiffs' contention that the government played little or no role in the development of these products. For instance, according to the 2004 Fire Fighting Foam Coalition report, "[b]ecause of the quantities of flammable liquids and the unique hazard of military operations, DOD agencies have always played a major role in the development and deployment of fire fighting foams." (See Aug. 2004 Report at 5.)

Significantly, viewing the facts in the light most favorable to Manufacturing Defendants, the Mil-Spec compels manufacturers to include PFCs in their formulations, which is the alleged design defect at the heart of this case. See In re Agent Orange Prod. Liab. Litig., 517 F.3d at 90 ("Defendants asserting

the defense must demonstrate that the government made a discretionary determination about the material it obtained that relates to the defective design feature at issue."). For example, a 2017 GAO Report provides that the Mil-Spec calls for fluorocarbon surfactants, which the U.S. Navy interprets as requiring "PFCs." (2017 GAO Report at 17 n.46.) In fact, the GAO Report states that "at present there is no PFC-free firefighting foam that meets DOD's performance and compatibility requirements. As a result, the Navy has no plans to remove the requirement for firefighting foam to contain PFCs at this time." (2017 GAO Report at 19.) In line with that report, the current revision of the Mil-Spec expressly contemplates the use of PFOS and PFOA in AFFF, setting maximum content levels for the chemicals. (MIL-PRF-24385F(SH) §§ 3.2, 3.3, 6.6, and Table I.) And according to Novac's Declaration, to his knowledge, Mil-Spec-compliant AFFF products must contain PFCs, "including those that either contain or may break down to at least some level of PFOA and/or PFOS." (Novac Decl. ¶¶ 6-8.) That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design. See In re Agent Orange Prod. Liab. Litig., 517 F.3d at 95-96 (2d Cir. 2008) ("Although the [Boyle] Court used the term 'reasonably precise specifications,' we think that . . . reordering the same product with knowledge of its

relevant defects plays the identical role in the defense as listing specific ingredients, processes, or the like."); (2017 GAO Report at 19 (noting that the Navy currently requires PFCs but that DoD has also been working to address "PFOS and PFOA levels that exceeded EPA's health advisory levels for drinking water"). Therefore, the evidence before the Court suggests that the DoD "made a discretionary determination about the material it obtained"--AFFF--"that relates to the defective design feature at issue"--the use of PFCs--and that as a result, DoD is the "'agent[ ] of decision.'" <u>In re Agent Orange Prod. Liab. Litig.</u>, 517 F.3d at 90-91 (quoting <u>In re Joint E. & S. Dist. New York Asbestos Litig.</u>, 897 F.2d at 630).

Plaintiffs also argue that Manufacturing Defendants were simply selling "stock," "off-the-shelf" AFFF products, and that as a result, Manufacturing Defendants may not avail themselves of the government contractor defense.[15] (Pl.s' Br. at 13.) According to Plaintiffs, Manufacturing Defendants used the same formulation for products sold to private companies and the DoD. (Pl.s' Br. at 9.) Plaintiffs also highlight the Cheremisinoff Affidavit, which

_____

[15] While Plaintiffs raise this argument within the context of whether Manufacturing Defendants have <u>complied with</u> reasonably precise specifications, the Court addresses it as part of whether the government has <u>approved</u> such specifications. <u>See In re Agent Orange Prod. Liab. Litig.</u>, 517 F.3d at 90-91 (holding that use of commercially available components in Agent Orange did not preclude conclusion that the government approved reasonably precise specifications for it).

provides that approximately fifty-five percent of AFFF products that contained fluorinated surfactants were sold to agencies outside of the federal government. (Pl.s' Br. at 13; Cheremisinoff Aff. at 6 ¶ 11.)

"If the government buys a product 'off-the-shelf'--'as-is'--the seller of that product cannot be heard to assert that it is protected from the tort-law consequences of the product's defects." In re Agent Orange Prod. Liab. Litig., 517 F.3d at 90. However, that a government-procured product incorporates commercially available elements "says nothing about whether the finished product resulted from the exercise of governmental discretion as to its design." Id.

At this stage of the litigation, there is colorable evidence that Mil-Spec AFFF is not a stock product. First, the allegations and evidence suggest that AFFF produced for commercial purposes is not identical to that produced pursuant to the Mil-Spec. Plaintiffs' Complaint distinguishes between the two: "Unlike commercial AFFF formulations, AFFF sold to the United States military must conform to the military-specific performance and quality control measurements as prescribed by the military specification ('Mil-Spec') Mil-F-24385." (Compl. ¶ 157.) Additionally, according to evidence submitted by Manufacturing Defendants, Mil-Spec AFFF generally "contain[s] more fluorosurfactant and more fluorine than [non-Mil-Spec] UL agents."

(Aug. 2004 Report at 2.) Further, there is evidence that the majority of AFFF in the federal sector is Mil-Spec AFFF and that "UL listed AFFFs would be in the majority in all other use sectors." (Aug. 2004 Report at 25.) Given that Plaintiffs seek to hold Manufacturing Defendants responsible for their use of fully fluorinated chemicals, the differences in fluorosurfactant and fluorine content are significant. See In re Agent Orange Prod. Liab. Litig., 517 F.3d at 90-91 (finding that Agent Orange was not a "stock" product even though it incorporated commercially available elements because the finished product was the result of government discretion, evidenced in part by higher concentration of chemical at issue).

Second, that Manufacturing Defendants may have sold Mil-Spec AFFF to non-federal agencies is not determinative; the critical question is whether the government exercised discretion with respect to the allegedly defective design element. See id. at 90. Viewing the facts in the light most favorable to Manufacturing Defendants, the government required the use of PFCs in Mil-Spec AFFF products, which are commercialized only after qualification and approval for listing on the QPL. (E.g., MIL-PRF-24385F(SH) §§ 3.1, 3.2.) Because the government contractor defense "protects government contractors from the specter of liability when the operation of state tort law would significantly conflict with the government's contracting interest," it follows

39

that PFC-based AFFF sold to the government pursuant to the Mil-Spec fits within the defense even if it is also later sold to non-governmental entities.  See In re Agent Orange Prod. Liab. Litig., 517 F.3d at 88 (citing Boyle, 487 U.S. at 507, 108 S. Ct. at 2515-16); Boyle, 487 U.S. at 509, 487 U.S. at 2517 ("Here the state-imposed duty of care that is the asserted basis of the contractor's liability . . . is precisely contrary to the duty imposed by the Government contract . . . .").  Concerns over interference with the government's ability to contract for products it needs remain even if private parties later purchase those products.  The examples of stock products that Plaintiffs cite in support of their argument--readily available helicopters ordered by the military "by model number," Boyle, 487 U.S. at 509, 108 S. Ct. at 2517, and ordinary toothpaste in its usual commercial packaging sold to the government, In re "Agent Orange" Prod. Liab. Litig., 304 F. Supp. 2d 404, 434 (E.D.N.Y. 2004), aff'd sub nom. In re Agent Orange Prod. Liab. Litig., 517 F.3d 76 (2d Cir. 2008)--do not compel a different result:  Both examples contemplate the government's procurement of a product that already existed, the design of which the government did not influence.  (See Pl.s' Br. at 13.)

In sum, there is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products.

Because Plaintiffs allege that the inclusion of these chemicals in AFFF violates state law and the government views AFFF as essential to its military mission, the precise conflict contemplated by the government contractor defense exists:

> The first Boyle requirement is designed to ensure that "a conflict with state law exists." We have observed that, therefore, "answering the question whether the [g]overnment approved reasonably precise specifications for the design feature in question necessarily answers the question whether the federal contract conflicts with state law." If such specifications are present, the contractor's federal contractual duties will inevitably conflict with alleged state tort duties to the contrary because complying with the federal contract will prevent compliance with state tort law as the plaintiffs have alleged that it exists.

In re Agent Orange Prod. Liab. Litig., 517 F.3d at 93 (internal citations omitted) (alterations in original); see also id. at 96-97 ("[T]he federal interest implicated by the lawsuits here is . . . the ability to pursue American military objectives--in this case, protection of American troops against hostile fire."). Thus, at this stage of the litigation, sufficient evidence supports that the government approved reasonably precise specifications for Manufacturing Defendants' AFFF products.

### 2. Compliance with Specifications

There is also colorable evidence supporting the second requirement of the government contractor defense--that Manufacturing Defendants' AFFF products conformed to the

government's reasonably precise specifications. They submitted evidence that pursuant to the Mil-Spec, the government inspected and approved their AFFF formulations for listing on the QPL. (See, e.g., MIL-PRF-24385F(SH) §§ 3.1, 6.4; Mil-F-24385 QPL/QPD History for Type 3 AFFF, Fleming Decl. Ex. D-3, Docket Entry 22-4 (listing Manufacturing Defendants' AFFF products on QPL); Mil-F-24385 QPL/QPD History for Type 6 AFFF, Fleming Decl. Ex. D-4, Docket Entry 22-5 (same); Compl. ¶ 159 (alleging that Manufacturing Defendants "were all on the DOD [QPL] as manufacturers certified to sell AFFF under Mil-F-24385 at various times from 1976 through 2017"); see also Novac Decl. ¶ 10 ("I am aware that the [DoD] has tested [Mil-Spec] AFFF products of Tyco [ ] and other [Mil-Spec] AFFF manufacturers, including with regard to among other things, PFOA and/or PFOS content and levels.").) Thus, the evidence suggests that the government "would not have accepted [their products] had [they] not conformed to th[e] specifications." See Cuomo, 771 F.3d at 117.

### 3. Warning the Government of Unknown Dangers

Defendants can satisfy the third government contractor defense requirement—that they warned the government of unknown dangers--by showing either that (1) they informed the government of known, relevant dangers that are "'substantial enough to influence the military decision' made," or (2) they did not need to warn the government because it was already aware of the

42

information, In re Agent Orange Prod. Liab. Litig., 517 F.3d at 99

(quoting In re Agent Orange Prod. Liab. Litig. MDL No. 381, 818

F.2d 187, 193 (2d Cir. 1987)) (citation omitted).

Plaintiffs argue that "[Manufacturing] Defendants did

not inform the DOD that purchased their products of their

understanding of the contaminating nature of their surfactant

ingredients (PFOA and PFOS), extreme solubility, persistence in

the environment, mobility through soil, and mobility through

groundwater." (Pl.s' Br. at 14.) Moreover, they maintain that

"[Manufacturing] Defendants took affirmative steps to mislead the

DOD and ignore the risks created from the normal handling and use

of their products." (Pl.s' Br. at 15.) Specifically, Plaintiffs

aver that since as early as the 1960s, 3M and Tyco concealed or

failed to inform the government of the known dangers of their PFC-

based AFFF products. (See Compl. ¶¶ 173-79; Cheremisinoff Aff. at

9-14, ¶¶ 1-24.)

In response, Manufacturing Defendants contend that they

submitted colorable evidence supporting the fact that "[t]he

United States has long understood that AFFF may contain or break

down into PFOS and/or PFOA, that AFFF constituents can migrate

through the soil and potentially reach groundwater, and that this

may raise environmental or health issues." (Mfg. Def.s' Opp. at

20.) In support, they point to seven government documents prepared

between 1980 and 2002, which suggest that the government was aware

of various risks posed by PFC-containing AFFF.  (Mfg. Def.s' Opp.
at 20-22.)

Plaintiffs point out that while Manufacturing Defendants
were able to find instances, beginning in 1980, where the
government acknowledged environmental issues with AFFF products,
Manufacturing Defendants began selling AFFF to the government in
1967.  (Pl.s' Reply at 4.)  Thus, they argue, the evidence shows
that Manufacturing Defendants should have warned the government
prior to 1980.  (See Pl.s' Reply at 4.)  However, Manufacturing
Defendants note that Plaintiffs' allegations concern only a subset
of Manufacturing Defendants.  (Mfg. Def.s' Opp. at 22-24.)  They
underscore the fact that Chemguard's AFFF products were first
listed on an AFFF QPL in 1998.  (Mfg. Def.s' Opp. at 24; Mil-F-
24385 QPL/QPD History for Type 3 AFFF.)  Therefore, Manufacturing
Defendants contend, Chemguard was not required to warn the
government of risks known to the military since 1980.  (See Mfg.
Def.s' Opp. at 20-24; Oct. 1980 Report at 1, 3, 17.)

The Court agrees that there is colorable evidence that
Chemguard, at least, was not required to warn the government of
the alleged defects of PFC-based AFFF products.  Specifically,
evidence suggests that the DoD was aware of PFCs' potential hazards
before Chemguard began selling AFFF to the government, and "the
government did not need the warnings because it already possessed
the information."  (Mfg. Def.s' Opp. at 20-24); see In re Agent

Orange Prod. Liab. Litig., 517 F.3d at 99; see also Gordon, 990 F.
Supp. 2d at 319 (citations omitted) ("Where the government has an
informational advantage, Boyle's third prong does not require
evidence that defendants warned the government.").    Thus,
Manufacturing Defendants have supported this requirement with
evidence sufficient to prevent remand.    See Breaux v. Gulf Stream
Coach, Inc., No. 08-CV-0893, 2009 WL 152109, at *2 (citation
omitted) (E.D. La. Jan. 21, 2009) ("The federal officer removal
statute confers jurisdiction only if at least one of the
[d]efendants" satisfies its requirements.); see also Albrecht,
2011 WL 5109532, at *3.

      In light of the foregoing, Plaintiff's motion to remand
is DENIED.[16]    However, the Court notes that Manufacturing
Defendants have merely provided colorable evidence sufficient to
support its government contractor defense at this stage, which
says nothing of whether the defense will succeed.    See Cuomo, 771
F.3d at 117.

---

[16] In light of Magistrate Judge Anne Y. Shields' September 12,
2018 Electronic Scheduling Order, which provides that "all
discovery will go forward in its entirety," (see, Sept. 2018
Elec. Sched. Order), the Court declines Plaintiffs' alternative
request for "a short period of discovery limited to the issue of
the government contractor defense," (see Pl.'s Br. at 17).

II.  Manufacturing Defendants' Motion for Leave to File a
     Sur-Reply

          In light of the resolution of Plaintiffs' motion to
remand, Manufacturing Defendants' motion for leave to file a sur-
reply is DENIED AS MOOT.  In any event, the Court notes that
Manufacturing Defendants' proposed sur-reply is an unhelpful
rehash of the arguments in their opposition.

                            CONCLUSION

          For the foregoing reasons, Plaintiffs' Motion to Remand
(Docket Entry 16) and Manufacturing Defendants' Motion to Leave to
File Sur-Reply (Docket Entry 31) are DENIED.  Defendants shall
answer or otherwise respond to the Complaint within thirty (30)
days of the date of this Memorandum and Order.  Pursuant to the
Court's July 30, 2018 Electronic Order, should Defendants wish to
move to dismiss the Complaint, they are not required to submit
pre-motion conference requests, but may file their motions within
the thirty-day (30) period.  Plaintiffs' opposition shall be filed
within thirty (30) days thereafter, and Defendants shall have
fourteen (14) days from the date of the opposition to file reply
briefs.

                                        SO ORDERED.


                                        /s/ JOANNA SEYBERT
                                        Joanna Seybert, U.S.D.J.

Dated:     September   30  , 2018
           Central Islip, New York